UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

KENDRICK RAYFORD                                        CIVIL ACTION

VERSUS                                                 NO. 11-2206

SHERATON OPERATING CORP.,
  D/B/A SHERATON NEW ORLEANS                           SECTION  "N"  (5)

## ORDER AND REASONS

Presently before the Court is Defendant's "Motion for Attorneys' Fees, Motion to Tax Costs, and Alternative Rule 11 Motion for Sanctions" (Rec. Doc. 43).  Having carefully reviewed the parties' submissions[1] and applicable law, **IT IS ORDERED** that Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the motion is granted to the extent that Defendant seeks to recover taxable fees from Plaintiff, Kendrick Rayford, pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920. It is denied, however, to the extent that Defendant seeks an award of attorney's fees and non-taxable costs.

## ANALYSIS

On Friday, August 10, 2012, during the course of deposing Defendant's witnesses, Plaintiff, through counsel, verbally communicated an intent to dismiss his case with prejudice. Written notice of this intent and a proposed motion to dismiss were provided to defense counsel on Monday, August 13, 2012.  Although agreeing that Plaintiff's claims should be dismissed with

---

[1]     See Rec. Docs. 43-1, 44 and 40. The Court also reviewed the parties' memoranda filed in connection with Plaintiff's motion to dismiss, which was granted on September 28, 2012. See Rec. Docs. 30-1, 35, 41, 42.  The instant motion followed.

prejudice, Defendant contends that Plaintiff and counsel should be required to pay its attorney fees and costs.  Plaintiff disagrees.  Having previously granted dismissal of Plaintiff's claims, the Court now addresses the propriety of an award of attorney's fees and/or costs.

## I.  Attorney's Fees and Non-Taxable Costs

### A.  Plaintiff Kendrick Rayford

Defendant's request for attorney's fees and non-taxable costs from Plaintiff is made pursuant to 42 U.S.C. § 2000e-5(k).  Defendant's request relative to Plaintiff's counsel, Elmer G. Gibbons, III, and Dwight W. Norton, (hereinafter "Plaintiff's counsel"), is made pursuant to 28 U.S.C. § 1927 and, alternatively, Federal Rule of Civil Procedure 11.

Focusing first on Plaintiff, 42 U.S.C. § 2000e-5(k) provides:

(k) Attorney's fee; liability of Commission and United States for costs

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

In applying this statute, the Supreme Court has determined that a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.  *See Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 418 (1978).  With respect to a prevailing defendant, however, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so."  *Id.* at 422.  The Fifth Circuit has further cautioned: "a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without

2

foundation.'" *Offord v. Parker,* 456 Fed. Appx. 472, 2012 WL 13929, *1 (5th Cir. 2012) (quoting

*Christiansburg*, 434 U.S. at 421).[2]  Instead, the court must ask whether "'the case is so lacking in

arguable merit as to be groundless or without foundation rather than whether the claim was

ultimately successful.'" *Id.* (quoting *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 997 (5th

Cir. 2008)).

       With respect to a civil rights plaintiff who voluntarily dismisses his claim with

prejudice, the Fifth Circuit instructs that "a defendant is not a prevailing party . . . unless the

defendant can demonstrate that the plaintiff withdrew to avoid a disfavorable judgment on the

merits." *Dean v. Riser*, 240 F.3d 505, 511 (2001).  "If this affirmative burden is met, the defendant

must then establish that the plaintiff's suit was frivolous, groundless, or without merit." *Id.*[3]

"Ordinarily, these inquiries can be resolved from the record developed in the case before the court,

supplemented by affidavits and, only if necessary, testimonial evidence." *Id.*

       In conducting this inquiry, the Court, as an initial matter, strongly emphasizes that,

as Plaintiff's opposition memorandum correctly points out, the pertinent question here is *not* whether

Defendant's personnel reasonably believed that Plaintiff had stolen items from Defendant's Lost and

---

   [2]   In *Christianburg,* 434 U.S. 422, the Supreme Court explained:  "No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable.  Decisive facts may not emerge until discovery or trial.  The law may change or clarify in the midst of litigation.  Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."

   [3]   Given the quoted language from *Stover* and *Offord*, as well as the Supreme Court's language in *Christianburg*, the Court construes "without merit" in *Dean* to mean "lacking arguable merit", groundless, or without foundation.  *See Christiansburg*, 434 U.S. at 421 (the term "meritless," is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case").

3

Found storage room, or whether good cause existed for Plaintiff's termination.[4] Nor, significantly, is the Court tasked with deciding the propriety of an attorney's fee award against Plaintiff at the conclusion of a trial on the merits during which the Court, and/or a jury, had the opportunity to fully evaluate the credibility of all key witnesses, including Plaintiff.  Instead, as set forth above, the Court, considering the parties' submissions, is charged with determining only whether Defendant has borne its burden of demonstrating that Plaintiff's suit was frivolous, groundless, or without merit from the outset, or whether Plaintiff continued to litigate after it clearly became so. Having conducted this inquiry, the Court finds this question to be a close one.  Nevertheless, the Court concludes, on the showing made, and considering the specific facts and circumstances at hand, that Defendant has failed to satisfy its burden.

---

[4]     This point is an important one as many facts, when considered together, arguably support Defendant's personnel's alleged theft suspicions and termination of Plaintiff's employment. Indeed, a reasonable person could find Plaintiff's behavior, as depicted on the June 5, 2011 video, odd if, as Plaintiff contends, he had received permission from his supervisor, Craig Haas, to take the "blue item" home, unless Plaintiff perhaps simply wanted to avoid having anyone else ask about why he had or was taking the item in question. Plaintiff's explanation regarding the discrepancies in the "iPad documents," i.e., the FedEx airbill and the Lost and Found tickets, also is a concern. The Court understands Plaintiff to contend that he mistakenly transferred the wrong information from his notepad to the iPad documents. Nevertheless, there appears to be no "Almonaster Highway" or "36259" zip code in the state of Texas, much less within the city of Dallas. A reasonable juror, moreover, could find the absence of a FedEx tracking record (reflecting package pick up at the Sheraton or delivery to the addressee) likewise worthy of suspicion.  This is particularly true given the absence of any record of followup inquiry from the addressee upon not receiving the iPad. Lastly, although possibly mere coincidence, with no bearing as to Plaintiff's alleged theft of Lost and Found items, Plaintiff's deposition transcript reveals that he admittedly has not always been completely truthful in recounting his employment history in written job applications.

In support of this conclusion, the Court notes the combination of several factors that arguably facilitated Plaintiff's alleged belief that he was fired because Defendant's personnel had discovered that he had filed a civil rights claim against his immediately prior employer, Churchill Downs, and preclude the Court from finding that the Plaintiff's action was frivolous, groundless, or without arguable merit from the outset, or that Plaintiff continued to litigate after it clearly became so.  First, and significantly, Plaintiff here asserted claims based on verbal statements allegedly made to him by the Director of Security, Antonio Rodriguez, and/or the Director of Human Resources, Colleen Moore, during a meeting that only the three of them attended.  Thus, unfortunately, there are no uninvolved witnesses to the conversation. Furthermore, despite the seeming significance of notes taken by Moore during the meeting of what was said therein,[5] her contemporaneous notes were not provided to the Court as part of Defendant's submission.

Second, and also important, it is undisputed that, during the June 11, 2011 meeting, although Plaintiff was asked what he knew about certain particular items found to have been missing from Lost and Found in *prior* months, including a camera and, according to Plaintiff, a GPS device,[6]

---

[5]    See Transcript of August 10, 2012 Deposition of Antonio Rodriguez ("Rodriguez Dep.")(Sealed Rec. Doc. 44-8), pp. 41, 45-47, 56;  *id.* at p. 46 ("She [Moore] was in charge, so obviously she had to take notes about the conversation that we were having to make sure that I was not asking anything inappropriate or not saying anything inappropriate.");  Transcript of August 10, 2012 Deposition of Colleen Moore ("Moore Dep.")(Sealed Rec. Doc. 44-7), pp. 36-37, 42-44 and 55 (referencing her note-taking);  Rodriguez also testified, however, that he has never seen Moore's notes.  See Rodriguez Dep., p. 46.

[6]    See Transcript of August 9, 2012 Deposition of Kendrick Rayford ("Plaintiff's Dep.") Rec. Doc. 54)(Sealed), pp. 193-201, 227-29, 234; Plaintiff's Equal Employment Opportunity Commission Statement ("EEOC Statement") (Rec. Doc. 43-8, p. 1); Rodriguez Dep., pp. 42-45, 55, 65-68;  June 13, 2011 Report by Antonio Rodriguez, Director of Loss Prevention ("Rodriguez Report") (Rec. Doc. 43-6), p. 2.  Although Rodriguez recalled mentioning a camera, he did not remember if a GPS device also was specifically referenced.  See Rodriguez Dep., pp. 43-45, 55, 68-69.

Rodriguez and Moore *never* told Plaintiff that he was suspected of theft, or specifically referenced the alleged May 6, 2011 iPad video, the apparent discrepancies in the FedEx and Lost and Found documents concerning the iPad, or the "blue item" seen in the June 5, 2011 video,[7] that reportedly motivated Defendant to investigate and then terminate Plaintiff.[8]  Rather, it appears that more general questions concerning how things were going in the department, how Plaintiff felt in the department, the importance of following policies and procedures, "doing the right thing," and honesty made up most of the conversation.[9]  Additionally, even when Plaintiff was told he was being terminated, Moore simply read a general passage from Defendant's associate handbook regarding violation of  "policies," as an explanation, without identifying the specific violation(s) or policy(ies) in question.[10]

Third, when Plaintiff asserted, during the June 11, 2011 meeting, that he had not taken the camera or other specific items  found to have been missing in months past, Rodriguez undisputedly responded that "nobody's saying that you are taking any items out of anywhere," but, given Plaintiff's statement, then continued on to ask Plaintiff if he had ever "taken" anything from

---

[7]        As discussed further, *infra*, Plaintiff, in his deposition, identified this item as a heating pad with a broken cord that his supervisor, Craig Haas, allegedly told him that he could have.  See Plaintiff's Dep., pp. 164-180, 193, 207;  October 2012 Affidavit of Kendrick Rayford ("Plaintiff's Affid.") (Rec. Doc. 44-6), ¶5.

[8]        See Moore Dep., pp. 48-58;  Rodriguez Dep., pp., 39-40, 44-45, 65-72, 77-79, 85; Plaintiff's Dep., pp. 195-96.

[9]        See Moore Dep., p. 47;  Rodriguez Dep., pp. 39-42, 56, 66-67; Rodriguez Report, Rec. Doc. 43-6, p. 2.

[10]        Although the pertinent handbook provision was referenced in the depositions of both Moore and Rodriguez, the undersigned was not provided with a copy of it and, thus, cannot elaborate further regarding it.  See Rodriguez Dep., pp. 56, 79-81;  Moore Dep., pp. 33, 47.

the hotel."[11]  Plaintiff apparently responded that he had only taken food, i.e., a "to-go box."[12] Although apparently believing the contrary to be true, neither Rodriguez nor Moore ever communicated this fact to Plaintiff.[13]  Indeed, Rodriguez represents that he asked Plaintiff if he had ever taken anything from the hotel only when Plaintiff first volunteered that he had not taken the items found to have been missing in prior months.[14]  Instead, according to Plaintiff, Moore and Rodriguez told him that they knew he had been discharged from Churchill Downs because he allegedly was "stealing time,"and then asked him numerous questions about his termination and the resulting lawsuit he had filed.[15]  On the other hand, according to Moore, Plaintiff was simply advised that Defendant's personnel had "information showing he wasn't following policies and procedures and now would be a good time for him to tell us about it."[16]

Fourth, and arguably providing more confusion as to what actually was said at the meeting,  as opposed to possibly implied or inferred, the alleged statements regarding Plaintiff's prior employment and lawsuit against his former employer, Churchill Downs, were made within

---

[11]     See Rodriguez Dep., pp. 42-43, 55, 65-66.  Rodriguez testified that he told Plaintiff, "that's not what we are talking about[,b]ut since you're mentioning that, have you ever taken anything out of the hotel or out of Lost and Found." Id. at 65; see also Plaintiff's EEOC Statement (Rec. Doc. 43-8, p. 1)("He [Rodriguez] stated 'now we are not accusing you of stealing.'").

[12]     Id.

[13]     See Rodriguez Dep., pp. 55-56, 65-72, 77-79, 85;  Moore Dep., pp. 48-54.

[14]     See Rodriguez Dep., pp. 55, 65;  Rodriguez Report (Rec. Doc. 43-6), p. 2.

[15]     See Plaintiff's Dep., pp. 95-96, 194-201, 227-29, 234;  Plaintiff's Affid. (Rec. Doc. 44-6), ¶ 3; Plaintiff's EEOC Statement (Rec. Doc. 43-8), pp. 1-2.

[16]     See Moore Dep., pp. 47, 55.  Rodriguez testified that "there were some additional questions that were asked [but he does not] recall the specifics."  See Rodriguez Dep., p. 55.

approximately two days of Plaintiff having agreed to a confidential settlement of the suit,[17] and, according to Plaintiff, within a few days of his co-worker, Antoinette Barnes, having become aware of the suit.[18]  In his deposition, Plaintiff explains that, because of prior incidents, he believes Barnes likely told Rodriguez about the lawsuit.[19]

Nor did Defendant's post-termination actions relative to Plaintiff's application for unemployment benefits serve to dispel Plaintiff's belief regarding the basis of his termination. Defendant's June 13, 2011 "Separation Notice" to the Louisiana Workforce Commission states only that Plaintiff was discharged for "unsatisfactory performance."[20]  Furthermore, the day after Plaintiff's counsel submitted documentary exhibits for the hearing of the appeal filed by Defendant,[21] and communicated an intent to cross-examine Defendant's witnesses, as well as Plaintiff's understanding "that he was terminated because he refused to discuss [a lawsuit] with employees of Sheraton New Orleans,[22] Defendant offered no substantive response putting Plaintiff on notice regarding the suspicions and information allegedly informing its decisions.  To the contrary, defense counsel simply advised the administrative law judge, on January 12, 2012, that Defendant desired

---

[17]     See Plaintiff's Affid. (Rec. Doc. 44-6), ¶3.

[18]     See Plaintiff's Dep., pp. 95-100;  Plaintiff's Opposition Memorandum ("Plaintiff's Opp.")(Rec. Doc. 44), pp. 1, 10.

[19]     See Plaintiff's Dep., pp. 93-100, and 207.

[20]     See June 13, 2011 "Separation Notice" (Rec. Doc. 44-2).

[21]     These exhibits include documents that Plaintiff had submitted to the EEOC.  See January 11, 2012 Letter from Plaintiff's Counsel (Rec. Doc. 44-5), pp. 2-3.

[22]     *Id.*  Plaintiff's opposition memorandum indicates that Defendant's two witnesses were believed to be Moore and Rodriguez.  See Plaintiff's Opp. (Rec. Doc. 44), p. 6.

to withdraw its appeal of Plaintiff's award of unemployment benefits.[23]

      In support of its motion, Defendant makes much of the fact that, by June 8, 2012, at the latest, Plaintiff had received some written discovery, including the June 2011 reports prepared by Rodriguez and Plaintiff's supervisor, Craig Haas, shortly after Plaintiff's termination, as well as the video of Plaintiff's removal of the "blue item" from the Lost and Found storage room and security office on June 5, 2011,[24] thus providing evidentiary support for the allegations of theft set forth in Defendants' November 28, 2011 answer.[25]  While Defendant is correct that its discovery production provided important information to Plaintiff, the Court is not in a position to find that Plaintiff's only appropriate responsive course of action was to immediately dismiss the suit, particularly given Plaintiff's contention that Haas had told him that he could have the "blue item" shown in the June 5, 2011 video, and Plaintiff's professed belief that Barnes had told Rodriguez about his lawsuit against his former employer, Churchill Downs.

      Given these assertions, and considering that Plaintiff and his counsel had not been provided with sworn statements of pertinent defense personnel, or had an opportunity to interview them, and did not receive final written discovery responses until August 6 and 7, 2012, it was not unreasonable for Plaintiff and his counsel to believe it appropriate to at least take certain depositions,

[23]    See January 12, 2012 Letter from Defense Counsel (Rec. Doc. 44-5, p. 1); January 13, 2012 Order Terminating Adjudication (Rec. Doc. 44-5, p. 4). Moore testified that someone from the Human Resources office would have "handled" the hearing if there had been one. See Moore's Dep., pp. 39-40.

[24]    See June 15, 2011 Report by Craig Haas, Loss Prevention Supervisor ("Haas Report")(Rec. Doc. 43-5); Rodriguez Report (Rec. Doc. 43-6);  Defendant's May 10, 2012 Responses to Plaintiff's First Set of Interrogatories (Rec. Doc. 49-2); June 8, 2012 email between counsel (Rec. Doc. 44-14)(reflecting Plaintiff's counsel having "picked up" the June 5, 2011 video that afternoon).

[25]    See November 28, 2011 Answer (Rec. Doc. 3).

on August 10, 2012, prior to deciding whether to end the litigation.  Nor, significantly, did Plaintiff insist upon first completing all noticed depositions,[26] or await a defensive motion for summary judgment, before communicating his desire to dismiss.  Rather, Plaintiff's counsel verbally broached dismissal upon concluding Haas' deposition on Friday, August 10, 2012;  written notice, along with a proposed motion to dismiss, was provided to defense counsel the following Monday, August 13, 2012.  Thus,  although defense counsel were required to defend certain depositions, and possibly do some preparation for those not ultimately taken, attorney time expenditures were not as substantial as they could have been.[27]

Other points, when considered together with the foregoing, also influence the Court's analysis to some extent, and lessen the Court's confidence that Plaintiff's suit was completely groundless, even if, in hindsight, it was determined to lack sufficient supporting evidence.  For instance, although the May 6, 2011 video footage apparently recorded Plaintiff's removal of an iPad from Defendant's front security office, and suspicions that Plaintiff stole the iPad were amongst the events allegedly leading to his termination, this video was not preserved.  Defendant maintains that the video was not maintained because it alone would not have provided a basis for terminating Plaintiff, and that its security video routinely was recorded over, unless preserved, within ninety

---

[26]    Email between counsel that was provided to the Court reflects that depositions of additional defense witnesses had bee rescheduled from August 9-10, 2012 to August 22-23, 2012.

[27]    Given that two defense attorneys attended each of the depositions that were taken, and presumably would have continued doing so, these cost savings are hardly insignificant.  See Defense Counsel Time Report (Rec. Doc. 43-3), pp. 28-29 (reflecting attendance of defense counsel Daisy Kane and René Thorne at depositions).  The Court additionally notes that party resources likely would have been further conserved if defense counsel had agreed to Defendant's witnesses, rather than Plaintiff, being deposed first, as Plaintiff requested.  *Id.* at  pp. 8, 16-22, 26-29 (reflecting research of Defendant's entitlement to depose Plaintiff first and attorney time devoted to preparation for and attendance of Plaintiff's deposition);  Plaintiff's Opp. (Rec. Doc. 44), p. 10.

days.[28] While that may be true, the June 13 and 15, 2011 reports prepared by Rodriguez and Haas, respectively, treat the video with some importance.[29]

        Furthermore, within ninety days of the May 6, 2011 recording date, Plaintiff filed a retaliation charge with the Equal Employment Opportunity Commission ("EEOC") on June 22, 2011,[30] received a notice of right to sue letter on June 29, 2011,[31] and submitted an application to the Louisiana Workforce Commission for unemployment benefits on July 17, 2011.  Additionally, though the Court is not aware of the date an initial determination of unemployment benefits was made, the parties' submissions reflect that Defendant filed an appeal on August 19, 2011.[32]  Plaintiff also posits other video from May 6, 2011, given the placement of Defendant's security cameras, should show him leaving the room to obtain the correct FedEx container, and later placing it in the FedEx "pick up" bin outside the office, thus providing support for his assertion of innocence regarding the iPad.[33]  Nevertheless, Defendant's personnel did not preserve the May 6, 2011 iPad video.  Notably, Defendant also did not retain pertinent video footage from June 9 and 10, 2011, in which Plaintiff undisputedly failed to remove "two additional lost and found items . . . placed inside

[28]    See Defendant's Responses to Plaintiff's Second Request for Production of Documents (Rec. Doc. 44-9) at p. 2 of 4;  Rodriguez Dep., pp. 89-90.

[29]    See Haas Report (Rec. Doc. 43-5), p. 2; Rodriguez Report (Rec. Doc. 43-6) p. 1.

[30]    See Plaintiff's Equal Employment Opportunity Commission Charge of Discrimination ("EEOC Charge"), Intake Questionnaire, and accompanying statement ("EEOC Statement") (Rec. Docs. 43-7, 43-8, 43-17).

[31]    See Rec. Docs. 43-9, 43-10.

[32]    See August 29, 2011 Louisiana Workforce Commission Appeal Acknowledgment (Rec. Doc. 44-5, p. 5).

[33]    See Plaintiff's Dep. pp., 103-104, 142-44;  Plaintiff's Opp. (Rec. Doc. 44), pp. 8-11; Rodriguez Dep.,  pp. 89-107, and attachment 3.

the office [by Defendant's supervisory personnel as "bait"] to verify if [Plaintiff] would take the items and walk out with them."[34]

Regarding the June 5, 2011 video, moreover, which was preserved by Defendant, and submitted in support of its motion,[35] it is not clear, from the video alone, what the "blue item" in question is, yet Plaintiff undisputedly was not specifically asked about it prior to his termination. Nor is it apparent that Defendant asked any of the other security officers appearing in the video about the item despite it having been in plain view for a time – apparently at least an hour – either on a desk in the security offices, or on top of the radio charger where, according to Plaintiff's deposition testimony, security employees would put things that belonged to one of them.[36]   Indeed, the "blue item" is not identified with more specificity in the June 2011 reports prepared by Rodgriguez and Haas;  Haas' report actually does not mention the June 5, 2011 video or "blue item" at all.[37]   Further, although Moore, as the Human Resources Director, was involved in the decision to terminate Plaintiff, she testified that she never personally viewed the May 6, 2011 or June 5, 2011

---

[34]     See Rodriguez Report, Rec. Doc. 43-6; see also Defendant's August 6, 2012 Responses to Plaintiff's Second Request for Production of Documents (Rec. Doc. 44-9), p. 4 ("Surveillance footage from [June 9 and 10, 2011] was not retained because it did not reveal suspicious activity").

[35]     See Notice of Manual Attachment, Rec. Doc. 49-1.  Moore indicated that she understood the items to be "high dollar electronic" items, but she did not know exactly what they were.  See Moore Dep., p. 41.

[36]     See Plaintiff's Dep., p. 164 ("If the item belongs to you, you are to leave it there." ).

[37]     The Court does not have a transcript of Haas' deposition testimony, but understands that he denied giving Plaintiff permission to take any items from Lost and Found.  See Defendant's Memorandum (Rec. Doc. 43-1), pp. 10-11.  Rodriguez, when deposed, testified that Haas, upon seeing the June 5, 2011 film (prior to Plaintiff's termination) did not say anything, but "his reaction was in shock."  See Rodriguez Dep., p. 113.

videos (though she was aware of their existence) prior to Plaintiff's termination.[38]   But according to her,  the June 5, 2011 "blue item" video was described as depicting "another high dollar electronic item" that "was larger, like a laptop," and that Plaintiff brought it from the Lost and Found storage room into the front security office,  and later placed it under his jacket and removed it from the security office area.[39]

In his deposition, however, Plaintiff identifies the "blue item" as a heating pad with a broken cord that, Haas, his supervisor, allegedly had told Plaintiff that he could take home because the item had been unclaimed for the requisite time before being released to housekeeping staff, and then was found in the housekeeping "discard bin."[40]  Having the benefit of this explanation, as well as video of Plaintiff inspecting one of the cords accompanying the item, and then throwing it in the trash can, it appears to the Court that the item most likely was a heating pad, with a broken cord, as described by Plaintiff, not a " high dollar electronic item," that was "larger, like a laptop" as Moore indicates was described to her.  Nor is the Court aware that Defendant presently contends that the "blue item" actually was something other than a heating pad.  In any event, no such evidence has been presented.

Lastly, throughout its submissions, Defendant repeatedly argues that the allegations of Plaintiff's complaint are materially inconsistent with the Charge of Discrimination and accompanying statement that he filed with the EEOC, on June 22, 2011, because the complaint does not mention that Plaintiff was asked, during the June 11, 2011 meeting,  about items believed to

---

[38]     See Moore Dep., pp. 29-31.

[39]     *Id.,* pp. 30-31.

[40]     See Plaintiff's Dep., pp. 164-180, 193, 207;  Plaintiff's Affid. (Rec. Doc. 44-6), ¶5.

13

have been missing from the Lost and Found in prior months.  On the showing made, the Court finds no basis to conclude that Plaintiff sought to conceal Rodriguez's June 11, 2011 questions about those items.  The complaint, as drafted, provided notice to Defendant of the basis of his claim in accordance with Rule 8 of the Federal Rules of Civil Procedure.  Although Plaintiff could have included a comprehensive statement of facts in the complaint, more akin to that in his EEOC statement, he was not required to do so; in any event, the complaint clearly references his prior EEOC proceeding by number.[41]  Further, Plaintiff's EEOC documents, the complaint filed in this matter, and the medical records from Plaintiff's June 11, 2011 Emergency Room visit[42] all consistently aver that Plaintiff's employment was terminated when he refused, because of a confidentiality obligation, to answer Defendant's personnel's questions about a recently settled lawsuit against a prior employer.  Finally, the complaint, presumably unlike the EEOC charge of discrimination and accompanying statement, was prepared with the assistance of counsel.  Accordingly, without more, the Court finds this omission, at the initial pleading stage, to be of little significance to the Court's present inquiry.

As previously stated, Defendant's motion as to Plaintiff is a close one.  Considering the totality of the foregoing circumstances of this particular matter, and considering the legal burden borne here by Defendant, however, the Court has not achieved the comfort level necessary for an award of attorney's fees and non-taxable costs to be warranted.

---

[41]     See September 2, 2011 Complaint (Rec. Doc. 1), ¶4.

[42]     See June 11, 2011 Tulane Medical Center Consultation Report (Rec. Doc. 44-11).

B. **Plaintiff's Counsel**

Whether considered under 28 U.S.C. § 1927 or Federal Rule of Civil Procedure 11, Defendant's request likewise fails as to Plaintiff's counsel.  Give the nature of Plaintiff's allegations, a comprehensive evaluation of the case by counsel required access to persons employed, and evidence held, by Defendant.  For instance, Plaintiff's counsel obviously did not have firsthand knowledge of what was said during the course of the June 11, 2011 meeting when Plaintiff was fired.  Only three persons – Plaintiff, Rodriguez, and Moore – did.  As previously discussed, there is no indication that sworn testimony of pertinent defense employees, including Rodriguez, Moore, Haas and Barnes was made available – in affidavit form or otherwise – prior to deposition testimony being given.  Accordingly,  Plaintiff's counsel had little choice but to rely on Plaintiff's recollection of and representations regarding that meeting, and other pertinent events, until August 2012 when written discovery was completed and depositions commenced.[43]

Thus, on the showing made, the Court, is not convinced, without more, that Plaintiff's counsel did anything other than to properly advise Plaintiff relative to apparent problems of proof revealed during the course of discovery, resulting in verbal communications of dismissal on Friday,

---

[43]    Further coloring Plaintiff's counsel's perception of Plaintiff's case, as set forth in Plaintiff's opposition, was their awareness of Rodriguez's indictment on charges of being an accessory after the fact to aggravated rape and conspiracy to compound a felony relative to an incident allegedly occurring at Defendant's hotel in December 2010. See Plaintiff's Opp. (Rec. Doc. 44), pp. 11-12; Plaintiff's Reply in Support of Motion to Dismiss ("Plaintiff's Reply")(Rec. Doc. 41), p. 3;  *State v. Anthony Davis, Wilfredo A. Rodriguez, and Lila Schwary*, Criminal No. 510472, Section A, Parish of Orleans, State of Louisiana.  The Court notes that the Orleans Parish Criminal Sheriff's Docket Master indicates that Davis pled guilty to second degree kidnapping and aggravated battery on March 18, 2013, and that Rodriguez and Schwary are scheduled for a judge trial to be held on May 31, 2013.  Although Rodriguez and Schwary certainly are entitled to a legal presumption of innocence unless and until found guilty, the Court cannot say that Plaintiff's counsel was not entitled to at least consider the existing criminal matter in evaluating the legal viability of Plaintiff's retaliation claim against Defendant.

August 10, 2012, followed by a written proposed motion seeking dismissal with prejudice on Monday, August 13, 2012.  The Court is not privy to the specific details and timing of the conversations between Plaintiff and his counsel regarding the strengths and weaknesses of his case.[44] And, though the benefit of hindsight might suggest the wisdom of a different approach by counsel relative to Plaintiff's contentions, that is not the applicable standard to be applied by the Court. Hence, the Court fails to find that Plaintiff's counsel did not make reasonable inquiry regarding evidentiary support or, as contemplated by §1927, unreasonably and vexatiously multiplied this proceeding.[45]

## II.  Taxable Costs

For the aforementioned reasons, the Court declines to award attorney's fees and non-taxable cost to Defendant.  Nevertheless, given the different and less stringent standard applicable to Federal Rule of Civil Procedure 54(d), taxable costs shall be awarded, pursuant to that provision and 28 U.S.C. §1920, in Defendant's favor.  See Fed. R. Civ. P. 54(d) ("Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party.");  *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 430 (5th Cir. 2000)(*Christianburg* standard applicable to fee awards under 42 U.S.C. §2000e-5(k) but not Rule

---

[44]     The Court, however, notes representations in Plaintiff's reply memorandum (submitted in support of his motion to dismiss) regarding Plaintiff's counsel's ongoing review and discussion of case facts and evidence with Plaintiff during the course of the litigation, as well as Plaintiff's stated desire, in ultimately seeking dismissal, to "move on with his life."  See Plaintiff's Reply (Rec. Doc. 41), pp. 1-5.

[45]     Plaintiffs' counsel also argue that Rule 11 relief is not available to Defendant because of form and timing requirements set forth in Rule 11(c)(2).  Although the Court notes that a written motion to dismiss was transmitted to defense counsel less than 21 days following Defendant's July 31, 2012 letter (requesting dismissal and notifying of intent to seek Rule 11 sanctions), and the instant motion is not premised solely on Rule 11, the Court finds it unnecessary to resolve these additional contentions.

54(d) cost awards); *Lewis v. National Labor Relation Board,* 750 F.2d 1266, 1279-80 (5th Cir. 1985) (same).  Defendant shall submit a bill for such costs to the Clerk of Court pursuant to Local Rules 54.3 and 54.3.1.

## **CONCLUSION**

For the reasons stated herein, the Court is not persuaded that attorney's fees and non-taxable costs should be awarded in Defendant's favor against Plaintiff or his counsel.  An award of taxable costs shall be rendered against Plaintiff, however, upon Defendant's application therefor to the Clerk of Court in accordance with Local Rules 54.3 and 54.3.1.

New Orleans, Louisiana, this 30th day of May 2013.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**